# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 26, 2016

## STATE OF TENNESSEE v. LAJUAN HARBISON

**Appeal from the Criminal Court for Knox County**
**No. 101915    Steven W. Sword, Judge**

_____

### No.  E2015-02170-CCA-R3-CD – Filed September 14, 2016
_____

The Defendant, Lajuan Harbison, was convicted by a Knox County Criminal Court jury of attempt to commit second degree murder, a Class B felony, and employing a firearm during commission of a dangerous felony, a Class C felony.  *See* T.C.A. §§ 39-13-210(a)(1) (2014) (second degree murder), 39-17-1324 (2014) (employing a firearm during the commission of a dangerous felony), 39-12-101(a) (2014) (criminal attempt). The Defendant received an effective sixteen-year sentence.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions, (2) the trial court erred by denying his motion for a judgment of acquittal, and (3) the trial court erred by classifying him as a dangerous offender and ordering consecutive service of his effective sentence with his sentence in a previous case.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J. joined.

Leslie M. Jeffress (on appeal) and Mitchell Harper (at trial), Knoxville, Tennessee, for the appellant, Lajuan Harbison.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from a March 30, 2013 incident in which J.E.[1] was shot multiple times at an apartment complex. At the trial, Knox County Emergency Communications records manager Michael Mays testified that he provided the District Attorney's Office with audio recordings of 9-1-1 calls from March 30, 2013, which were played for the jury. The audio recordings reflect that two men and two women called 9-1-1 reporting that they had heard shooting, that a young man was shot and was lying on the ground asking for help, and that an ambulance was required. None of the callers were able to describe the shooter or knew where the shooter had gone.

An audio recording of exchanges between police officers and the police dispatcher was played for the jury. In the recording, an officer stated that a suspect ran toward a courtyard in the apartment complex where the shooting occurred, that the suspect may have gone inside an apartment unit, which had been secured, and that the suspect was described as a black man nicknamed "Jajuan" who was wearing all-black clothing. Later, the police officer stated that he had a suspect in custody who had a gun.

Knoxville Police Officer Rachel Warren testified that she collected evidence at the apartment complex. She said that she took photographs and collected a .25-caliber Raven Arms handgun, pieces of the victim's pants leg that had been cut off, a black toboggan, and eight .40-caliber Smith & Wesson cartridge casings. Officer Warren stated that at the hospital, she photographed the victim, who had several gunshot wounds to his legs. Officer Warren collected the victim's clothing at the hospital and noted bullet holes in the victim's pants leg and sock.

Photographs of the crime scene, a handgun, cartridge casings, bloodied pants leg, black toboggan, and the victim in the hospital were received as exhibits.

On cross-examination, Officer Warren testified that one cartridge casing was found near the patio of a ground level apartment and that the other cartridge casings were located in dirt on the other side of a sidewalk. She stated that the handgun was not loaded and that if the handgun had been fired, it would have ejected a shell casing.

The eighteen-year-old victim testified that the Defendant shot him on March 30, 2013. The victim said that as he walked through the breezeway from one apartment complex to another, the Defendant appeared with a gun and shot him. The victim stated that the Defendant did not say anything before shooting. The victim denied provoking the Defendant. The victim said that he fell after being shot twice. The victim said that

---

[1] It is the policy of this court to refer to victims who were minors at the time of the offense by their initials.

the Defendant walked into a building and that the victim was unable to run away due to his leg wounds.

The victim testified that his friend, J.M., was present during the shooting and that J.M. did not provoke the Defendant. The victim said that the Defendant shot him five or six times, that the victim required surgery on his right ankle joint, that screws and a ball were inserted into his right leg, and that his left leg was still numb at the time of the trial. The victim identified a photograph lineup in which he had circled the Defendant's photograph and signed the lineup sheet.

On cross-examination, the victim testified that he was shot as he and J.M. left a friend's apartment. The victim said he saw a light-skinned man with dreadlocks after he was shot. The victim said that the shooting occurred around 2:00 or 2:30 p.m. The victim denied knowing J.M. was carrying a gun. The victim said that he knew the Defendant from the neighborhood, that the Defendant's mother had been the victim's teacher, and that the victim did not have a problem with the Defendant.

J.M. testified that on March 30, 2013, he and the victim spent time at their friend's apartment and that they were walking around the apartment complex when the victim was shot. J.M. said that he was beside the victim when the shooting began and that J.M. ran away. Although J.M. stated that he did not have a clear view of the shooter, he identified the Defendant to the police immediately following the shooting. J.M. did not recall talking to the police after he was arrested on the day of the shooting. J.M. remembered that his godfather came to the scene, but he said he did not remember talking to his godfather about the shooter's identity. J.M. remembered talking to Investigator Amy Jinks about the shooter and identifying the Defendant in a photograph lineup. J.M. agreed that he told Investigator Jinks the Defendant shot the victim and said that he had known the Defendant for at least a year and that they "got along." J.M. stated that he did not know whether the Defendant said anything to him or the victim before the shooting.

On cross-examination, J.M. testified that when he identified the Defendant, he was handcuffed and was in the back of a police cruiser. He said that Investigator Jinks pointed at the photographs and that she circled the Defendant's photograph. He stated that he was intoxicated after ingesting Xanax and drinking alcohol when he made the identification. J.M. said that he had a clear view of the shooting but that he ran away as soon as he heard gunshots. J.M. agreed that he carried a .25-caliber gun on the day of the shooting. He did not remember having had a conversation with any of the people at the apartment complex or having seen a light-skinned man with dreadlocks. J.M. did not know whether the victim ingested Xanax. J.M. did not identify the Defendant as the shooter at the trial.

Knoxville Police Officer Sean Ford testified that he responded to the crime scene, that he saw the victim in a courtyard, that the victim was bleeding from multiple gunshot

wounds, and that Officer Ford secured the scene and interviewed the victim and J.M. Officer Ford said that other officers had arrested J.M. and escorted him to Officer Ford's police cruiser. Officer Ford stated that the audio and video recording system in his police cruiser recorded statements J.M. made to his godfather. Officer Ford said he overheard J.M. and the godfather's conversation, including J.M.'s identifying the shooter as "Jajuan," "Juan," and "Lajuan."

Knoxville Police Officer Patricia M. Resig, an expert in firearms examination, testified that she examined eight cartridge casings recovered at the crime scene and that based on markings on the cartridge casings, she concluded they were fired from the same .40-caliber handgun. She said it was possible the gun was a Smith & Wesson. On cross-examination, Officer Resig testified that she examined multiple handguns in relation to this case, that the handguns were of a different caliber than the cartridge casings, and that the markings on the cartridge casings were not associated with any handgun contained in the Integrated Ballistic Identification System (IBIS).

Knoxville Police Investigator Amy Jinks testified that she interviewed the victim at the emergency room. After their first conversation, Investigator Jinks stated that she asked her partner to bring two copies of a photograph lineup to the hospital and that she requested an officer bring J.M. to the hospital for an interview. Investigator Jinks said that the victim and J.M. were in different locations when they marked the lineup.

Investigator Jinks testified that she interviewed J.M., who was handcuffed, in Officer Ford's police cruiser. She said that she pointed to the individual photographs and asked J.M. whether the photograph depicted the shooter. Investigator Jinks stated that J.M. identified the Defendant, that she circled the Defendant's photograph, and that Investigator Jinks noted on the lineup sheet the police cruiser's number and J.M.'s being handcuffed. Investigator Jinks said that the victim was cooperative and that he identified the Defendant as the shooter from a copy of the photograph lineup.

On cross-examination, Investigator Jinks testified that when she interviewed J.M., she opened the police cruiser door and that Officer Ford remained in the front seat of the police cruiser. She said that J.M. was not cooperative and that he did not give her much information. She stated that J.M. named the shooter as Lajuan before viewing the lineup. She agreed that she spoke to the victim about two hours after the shooting. Investigator Jinks said that she asked the victim whether the lineup included the shooter's photograph and that the victim told her it did and circled the Defendant's photograph. On redirect examination, Investigator Jinks testified that neither the victim nor J.M. identified the light-skinned man with dreadlocks as the shooter.

Upon this evidence, the Defendant was convicted of attempt to commit second degree murder and employing a firearm during commission of a dangerous felony. This appeal followed.

## I & II

## Sufficiency of the Evidence & Motion for a Judgment of Acquittal

The Defendant contends that the evidence is insufficient to support his convictions. In a related issue, he contends that the trial court erred by denying his motion for a judgment of acquittal. Regarding each issue, he argues that the evidence was insufficient to support the attempted second degree murder conviction because no gun was found, no evidence was presented of bullets being found, and the identity of the shooter was not established beyond a reasonable doubt. He argues that by extension, no dangerous felony was proven to support the employing a firearm during the commission of a dangerous felony conviction. The State responds that the evidence is sufficient and that the trial court properly denied the Defendant's motion. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The standard of review for a trial court's denial of a motion for a judgment of acquittal is the same as the "standard that applies on appeal in determining the sufficiency of the evidence[.]" *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013).

## A. Attempt to Commit Second Degree Murder

The Defendant contends that the evidence is insufficient to support his conviction for attempt to commit second degree murder, arguing that no gun was found, that no evidence was presented showing bullets were found, and that the identity of the shooter was not established beyond a reasonable doubt. The State responds that the evidence is sufficient.

-5-

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). When identity of the perpetrator is solely based upon circumstantial evidence, the facts are required to be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993); *see Reid*, 91 S.W.3d at 277. "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

Second degree murder is defined as a knowing killing of another. *Id.* § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (Supp. 2011) (amended 2014). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2014). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. Intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93. A defendant commits criminal attempt when he acts "with the kind of culpability otherwise required for the offense . . . [and] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2).

In the light most favorable to the State, the victim testified that he and J.M. were walking in the apartment complex and that when they emerged from a breezeway, the Defendant approached and shot the victim multiple times. Relative to the identity of the shooter, the victim said that he knew the Defendant from the neighborhood and that the Defendant's mother had been the victim's teacher. The victim identified the Defendant as the shooter from a photograph lineup. Although J.M. testified that he could not remember whether the Defendant was the shooter or whether he identified the Defendant as the shooter to the police, J.M. said that he identified the Defendant as the shooter immediately following the shooting and that he identified the Defendant as the shooter from a photograph lineup. Investigator Jinks and Officer Ford testified that J.M. identified the Defendant as the shooter in a conversation with his godfather and that J.M. identified the Defendant from a photograph lineup. Investigator Jinks said that J.M. named Lajuan as the shooter before she showed him the photograph lineup. The victim's testimony that the Defendant was the shooter is sufficient to establish the Defendant's identify as the perpetrator, and witness credibility and any conflicts in the testimony were resolved by the jury in favor of the State.

Relative to the remaining elements of attempted second degree murder, the record reflects that the Defendant shot at the victim multiple times and wounded the victim's

legs such that the victim required orthopedic surgery. Although the gun used to shoot the victim was never recovered and no bullets were entered into evidence, every witness who saw the victim testified he had been shot. The victim and J.M. denied having prior conflicts with the Defendant, and they agreed that the Defendant did not speak to them before or after the shooting. A reasonable jury could have concluded that the Defendant intentionally shot the victim with the knowledge that shooting the victim was reasonably certain to kill him. The Defendant is not entitled to relief on this basis.

## B. Employing a Firearm During the Commission of a Dangerous Felony

The Defendant contends that because the evidence is insufficient to convict him of attempt to commit second degree murder, no dangerous felony was proven to support his remaining conviction. The State responds that the evidence is sufficient. We agree with the State.

Tennessee Code Annotated section 39-17-1324(b)(1) proscribes employing a firearm during the commission of a dangerous felony. Attempted second degree murder is an enumerated dangerous felony. *See id*. § 39-17-1324(i)(1)(B).

As stated above, the evidence is sufficient to support the Defendant's conviction for attempt to commit second degree murder. Eight .40-caliber cartridge casings were recovered at the scene, and Officer Resig determined that the cartridges were fired from the same gun. Although the gun was not recovered and no bullets were introduced into evidence, the presence of gunshot wounds on the victim's legs, the cartridge casings, and the testimony of the victim, J.M., and the responding police officers that the victim had been shot is sufficient evidence for a reasonable jury to have concluded that the Defendant employed a firearm to commit the dangerous felony of attempted second degree murder. The Defendant is not entitled to relief on this basis.

## III

## Sentencing

The Defendant contends that the trial court erred by sentencing the Defendant as a dangerous offender and by ordering consecutive service of his effective sixteen-year sentence to a previously imposed sentence. In the previous case, the Defendant was convicted of attempt to commit voluntary manslaughter and employing a firearm during the commission of a dangerous felony and was sentenced to twenty-two years.

At the sentencing hearing, the trial court considered the presentence report. The presentence report reflected that as of February 2, 2014, the Defendant was age twenty, that the Defendant's father died when the Defendant was age seven, and that the Defendant began to use drugs at age twelve. The Defendant reported poor mental health

beginning when his father died. The Defendant stated that he was placed on supervised probation his senior year of high school for driving on a suspended license and was eventually sent to a youth detention center, where he was an honor roll student. The Defendant said he enrolled in community college during high school and worked while seeking admission to the University of Tennessee. The Defendant said, though, that his mother's house was targeted in a drive-by shooting, that the Defendant felt as though he needed to protect his family, and that instead of allowing the police to handle the situation, he made "the wrong decision" to engage in the behavior underlying the convictions in the previous case. The Defendant said that he had a substantial record of volunteer work and involvement in extracurricular activities.

The presentence report reflected that the Defendant dropped out of high school but later completed high school at the youth detention center. The Defendant had a number of juvenile convictions for traffic offenses, violating curfew, weapon possession, and a revocation of probation.

The trial court found that the Defendant was not a good candidate for probation because he had two convictions involving shooting another person, he had a "propensity to engage in very dangerous behavior," and that confinement was necessary to protect society from the Defendant. The court noted that although the Defendant did not have a lengthy criminal history, it consisted solely of violent offenses. The court found that confinement was necessary to avoid depreciating the seriousness of the offense, which was "a shooting in the middle of the day . . . [for] no apparent reason[.]" The court found that confinement was necessary to deter others from the same behavior and that the Defendant had little potential for rehabilitation.

Relative to enhancement factors, the court noted the circumstances of the offense as an enhancement factor and the Defendant's "serious" criminal history, although the court found that the Defendant's criminal history was not "extensive enough to take it to the top of the range." *See* T.C.A. § 40-35-114 (2014).

Relative to classifying the Defendant as a dangerous offender, the trial court found that the Defendant's conviction for attempt to commit second degree murder and his convictions for attempt to commit voluntary manslaughter arose from situations in which the Defendant "engaged in a shooting where there are just people everywhere," that the shootings occurred in the middle of the day, and that the circumstances of the March 30 offense were "very aggravated . . . . This is a situation where you just saw somebody you didn't like [and] opened fire[.]" The court found that confinement for an extended period of time was necessary to protect the community from the Defendant, that consecutive sentences reasonably related to the offenses for which the Defendant was convicted, and that justice dictated the sentences in this case be served consecutively to the sentence previously imposed.

The trial court sentenced the Defendant to ten years for attempt to commit second degree murder and to six years for employing a firearm during the commission of a dangerous felony, for an effective sixteen-year sentence.[2] The court ordered the sentence to be served consecutively to the previously imposed sentence.

The standard of review for a trial court's imposition of consecutive sentences is an abuse of discretion with a presumption of reasonableness if the trial court places on the record adequate grounds to support its reasoning. *State v. Pollard*, 432 S.W.3d 851, 859, 863 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id.* A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one of the criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed," and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

Tennessee Code Annotated section 40-35-115(b)(4) states that a court may order a consecutive sentence if it finds by a preponderance of the evidence that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." In addition, "the record must also establish that the aggregate sentence reasonably relates to the severity of the offenses and that the total sentence is necessary for the protection of the public from further crimes by the defendant." *Pollard*, 432 S.W.3d at 863; *see State v. Wilkerson*, 905 S.W.2d 933. 938 (Tenn. 1995).

Relative to the Defendant's having little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, the trial court noted that in the present case as well as in the previous case, the Defendant opened fire during the day in front of crowded areas. The court noted that the Defendant began shooting in the instant case because he apparently saw someone he did not like, not due to any ongoing conflict. The evidence shows that Defendant appeared and began shooting the victim without saying a word. The court also found that the aggregate sentence reasonably related to the severity of the offenses and that extended confinement was necessary to protect the public from the Defendant, who had demonstrated a propensity for violent crime. The evidence does not preponderate against the court's findings, and we conclude that the court did not err by imposing consecutive service of the Defendant's sentences. The Defendant is not entitled to relief on this basis.

---

[2] We note that the Defendant's sentence for employing a firearm during the commission of a dangerous felony was required by statute to run consecutively to the sentence for attempt to commit second degree murder. *See* T.C.A. 39-17-1324(e)(1) (2014).

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE